UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DELORES EGGERSON,
Personal Representative
of the Estate of Leon Dandredge,

      Plaintiff,

v

MARK HESSLER and
KENNETH GROENVELD,

      Defendants.

Case No. 1:04-cv-425

Hon. Wendell A. Miles

_____/

OPINION AND ORDER ON DEFENDANT MARK HESSLER'S
MOTION FOR SUMMARY JUDGMENT

This is an action filed under <u>Bivens v. Six Unknown Named Agents of Fed. Bureau of
Narcotics</u>, 403 U.S. 388, 91 S.Ct. 1999 (1971), arising from the fatal shooting of plaintiff's
decedent Leon Dandredge in Muskegon, Michigan on August 20, 2003. The matter is currently
before the court on a motion by defendant Mark Hessler for Summary Judgment (docket no. 13).
Plaintiff has opposed the motion.

For the reasons to follow, the court GRANTS the motion.

**I**

Plaintiff, a resident of Marianna, Arkansas, is the personal representative of the estate of
Leon Dandredge. Defendant Mark Hessler is a Deputy United States Marshal in the Western
District of Michigan. In this action, plaintiff alleges that Hessler violated Dandredge's

constitutional rights under the Fourth Amendment when he shot and killed Dandredge on August 20, 2003.[1]

The following facts are undisputed. Hessler became aware of Dandredge in June, 2003, as part of Hessler's official duties, which included locating fugitives wanted for parole or probation violations in states other than Michigan. In May, 2003, a warrant for Dandredge's arrest had been issued in Marion County, Indiana after Dandredge reportedly violated the terms of his probation. It appears that Dandredge had only begun serving his probation in March, 2003, after serving time in prison on a 2001 conviction for criminal deviate conduct. The warrant for Dandredge's arrest was issued after Dandredge's probation officer reported that Dandredge had violated his probation by failing to report to the Probation Department as directed; by failing to make payments toward his court-ordered financial obligation; by failing to comply with court-ordered sex offender counseling; by failing to comply with court-ordered anger control counseling; by failing to comply with a court-ordered substance abuse treatment program; by failing to maintain a single verifiable address; by submitting urine samples on two different dates which tested positive for marijuana and for marijuana and cocaine, respectively; and, finally, by failing to provide a current address to law enforcement for purposes of registration, presumably as a sex offender.[2]

---

[1]Plaintiff has also asserted a <u>Bivens</u> claim against Deputy United States Marshal Kenneth Groenveld. On March 22, 2005, the court entered an order dismissing the claim against Groenveld, who did not fire his weapon during the incident in question.

[2]Indiana law requires sex offenders to register with law enforcement authorities. Ind. Code § 5-2-12-5. Dandredge's conviction for criminal deviate conduct subjected him to this registration requirement. Ind. Code § 5-2-12-4(a)(2) (defining as an "offender" a person convicted of criminal deviate conduct).

On June 5, 2003, Hessler received a report from the United States Marshals Service ("USMS") in Indianapolis, Indiana, which had received the probation violation warrant for Dandredge. The report indicated that Dandredge was believed to be residing in Muskegon, Michigan, where he had family. Attached to the report was documentation on Dandredge's criminal history, which included not only his criminal deviate conduct conviction but also a number of arrests for assault and battery and at least one conviction for battery. The Indiana USMS report concluded by requesting cooperation in the location and apprehension of Dandredge.

Hessler was able, conducting his own investigation, to corroborate the information on Dandredge provided by the Indiana USMS. In June, 2003, Hessler, along with Kenneth Groenveld, another Deputy United States Marshal, traveled to Muskegon, where they obtained information that Dandredge was working at a local house of worship, the Faith, Hope and Love Church. This information was apparently correct, for the pastor at Faith, Hope and Love advised that he would speak to Dandredge when Dandredge appeared for work. The pastor also indicated that he would report back to the marshals after he spoke to Dandredge.

Dandredge remained at large in July, 2003, and Hessler once again traveled to Muskegon on the fugitive's trail. This time Hessler was accompanied by another Deputy United States Marshal, John Simpson. On this visit, Hessler learned from a Muskegon police detective, Chad Nader, that Dandredge was a suspect in a criminal sexual conduct case involving a minor. Hessler and Simpson, along with Nader, continued to search for Dandredge. Their search led them back to the Faith, Hope and Love Church, where Dandredge's brother, Jonathan Eggleston, was a volunteer. Eggleston informed the officers that Dandredge was working at a Muskegon

3

tire store.  After confirming via telephone conversation with the store's manager that Dandredge was in fact employed there, the marshals instructed the manager not to alert Dandredge to their call and to make sure that Dandredge remained at work until they arrived.  By the time they arrived, however, Dandredge had fled, having apparently having been tipped off by a telephone call from Eggleston.

Shortly after this incident, Hessler again spoke with detective Nader, who indicated that he had been telephoned by Dandredge.  According to Nader, Dandredge wanted to know whether "the feds" were looking for him.  After Nader confirmed that the USMS was indeed attempting to apprehend Dandredge on the probation violation warrant, Dandredge confided that he did not want to return to jail.  According to Nader, however, Dandredge promised that he would turn himself in to Muskegon authorities on July 18, 2003.   Nader later informed Hessler that Dandredge had not in fact turned himself in as promised.  Nader also informed Hessler that Muskegon authorities had issued a warrant for Dandredge's arrest on criminal sexual conduct charges.

On August 20, 2003, the pursuit of Dandredge once again led Hessler and Groenveld to Muskegon.  According to information they had received from a Family Independence Agency counselor, Dandredge was expected to appear at a court hearing on that day with a woman named Wanda Henderson.  It appears that Henderson was the mother of a minor (or minors) connected with the criminal sexual conduct allegations against Dandredge.  Although Hessler and Groenveld hoped to intercept Dandredge at the Muskegon courthouse, Dandredge failed to appear at the scheduled hearing.  After the hearing, Hessler and Groenveld were able to learn from Dandredge's sister that he had been seen in the company of Henderson.  Dandredge's sister

4

provided the deputies not only with Henderson's Muskegon address, but also provided them with the description of the vehicle which she had recently seen her brother driving.

Based on this information, Hessler and Groenveld went to Henderson's residence. Hessler and Groenveld initially knocked on the front door of the residence.  Upon receiving no answer, they proceeded to the rear of the home, where they observed a vehicle matching the description given by Dandredge's sister as the one she had seen Dandredge driving.  Groenveld was eventually able to summon Henderson to the back door.  After the deputies showed Henderson their credentials and informed her why they were there, Henderson denied that Dandredge was in the residence but consented to a search of the property.

Hessler and Groenveld proceeded to search for Dandredge, beginning with the main floor of the residence.  After searching the main floor, Hessler asked Henderson whether the home had a basement.  Upon receiving an affirmative answer, Hessler then asked Henderson whether he would find Dandredge there, to which Henderson replied, "I don't know."  Believing that Dandredge might therefore be hiding in the basement, Hessler and Groenveld proceeded to search there.

As Hessler and Groenveld neared the bottom of a flight of stairs leading to the basement, they began to loudly and repeatedly announce their presence, identifying themselves as United States Marshals who possessed a warrant for Dandredge's arrest.  After reaching the bottom of the stairs, Groenveld stepped into a small, dimly lit laundry room.  Groenveld announced his presence and looked around the room, but saw no sign of Dandredge.  Both deputies continued to search.

After searching the remaining rooms of the basement, again repeatedly announcing their presence, but receiving no response, the deputies returned to the basement stairs. Groenveld began to climb the stairs. Hessler, however, went into the laundry room, having noticed piles of laundry throughout the room. Hessler specifically noted a very large pile of laundry located between a clothes dryer and the northwest corner of the room. Hessler, who was armed, approached this pile of laundry with his gun drawn and held near his right hip. As he prepared to lift a blanket on the pile of laundry, Dandredge suddenly bolted up and toward Hessler from underneath the blanket. Fearing for his life, Hessler defensively fired his weapon once, stepping backward as he did so. The shot which Hessler fired struck Dandredge in the right eye, immediately incapacitating him and resulting in his death.

After hearing the shot, Groenveld, who was on the basement stairs, turned and then saw Hessler in the doorway to the laundry room. Hessler informed Groenveld that he had shot Dandredge. Groenveld did not himself see the shooting; he did not see Dandredge until after Dandredge had already been shot. The first officer to arrive on the scene after the shooting, City of Muskegon police officer James Plouhar, found Dandredge in an upright but squatting position next to the clothes dryer in the northwest corner of the room, with his back against the wall. There is no dispute that Dandredge was unarmed at the time of his death, although there is no evidence that Hessler was aware, when he fired, that Dandredge was unarmed.

## II

Plaintiff's amended complaint filed in this case alleges that Hessler is liable for the death of Leon Dandredge because Hessler violated Dandredge's rights under the Fourth Amendment by

using "unnecessary, unreasonable, excessive and/or deadly force."   First Amended Complaint

and Jury Demand at 3, ¶ 12.  In his motion, Hessler argues that he is entitled to summary

judgment in his favor because there is no genuine issue of material fact that he had a reasonable

belief that Dandredge posed an imminent threat of bodily harm to Hessler.  Hessler contends that

under the circumstances, he is entitled to qualified immunity for his actions.

Summary judgment is proper where "the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to judgment as a matter

of law."  Fed.R.Civ.P. 56(c). "[T]he plain language of Rule 56(c) mandates the entry of summary

judgment, after adequate time for discovery and upon motion, against a party who fails to make a

showing sufficient to establish the existence of an element essential to that party's case, and on

which that party will bear the burden of proof at trial."  Celotex Corp. v. Catrett, 477 U.S. 317,

322-323, 106 S.Ct. 2548, 2552 (1986).  In evaluating a motion for summary judgment, the court

must determine "whether the evidence presents a sufficient disagreement to require submission to

a jury or whether it is so one-sided that one party must prevail as a matter of law."  Anderson v.

Liberty Lobby, Inc., 477 U.S. 242, 251-52, 106 S.Ct. 2505, 2512 (1986).

On summary judgment, the inferences to be drawn from the underlying facts must be

viewed in the light most favorable to the party opposing the motion.  Matsushita Elec. Indus. Co.,

Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587-88, 106 S.Ct. 1348, 1356 (1986).  However,

while inferences drawn from the underlying facts must be viewed in the light most favorable to

the party opposing the motion, "[w]hen the moving party has carried its burden under Rule 56(c),

its opponent must do more than simply show that there is some metaphysical doubt as to the

material facts." Id., 475 U.S. at 586, 106 S.Ct. at 1356.   The applicable substantive law governing the issue determines what facts are relevant; only factual disputes which may have an effect on the outcome of a lawsuit under the applicable substantive law are deemed "material." Anderson, 477 U.S. at 248.

Fed.R.Civ.P. 56(b) permits a defending party to move for summary judgment, with or without supporting affidavits, "at any time" after the action is filed.   Notwithstanding this express provision, "the general rule" which has developed  "is that summary judgment is improper if the non-movant is not afforded a sufficient opportunity for discovery."  Vance v. United States, 90 F.3d 1145, 1148 (6th Cir. 1996) (citing White's Landing Fisheries, Inc. v. Buchholzer, 29 F.3d 229, 231-32 (6th Cir.1994) and Plott v. General Motors Corp., 71 F.3d 1190, 1195 (6th Cir.1995)).   However, this case does not fall squarely within the general rule, insofar as Hessler has raised the defense of qualified immunity.   "Where the defendant seeks qualified immunity, a ruling on that issue should be made early in the proceedings so that the costs and expenses of trial are avoided where the defense is dispositive."  Saucier v. Katz, 533 U.S. 194, 200, 121 S.Ct. 2151, 2155-2156 (2001).  The Supreme Court has "emphasized that qualified immunity questions should be resolved at the earliest possible stage of a litigation."  Anderson v. Creighton, 483 U.S. 635, 646 n.6, 107 S.Ct. 3034, 3042 n.6 (1987).   Although the Supreme Court has noted the fact-specific nature of a reasonableness inquiry, it has continued to urge the early resolution of reasonableness questions in the context of qualified immunity. See, e.g., id., 483 U.S. at 641, 107 S.Ct. at 3040 (noting the "objective (albeit fact-specific ) question whether a reasonable officer could have believed Anderson's warrantless search to be lawful" and resolving the question as a matter of law). The Court has rejected an approach to qualified immunity that

would treat Fourth Amendment claims differently from other constitutional claims. See id., 483
U.S. at 643-44, 107 S.Ct. at 3041.

"[B]ecause the defense of qualified immunity is a threshold question, if the defense is
properly raised prior to discovery, the district court has a duty to address it." Summers v. Leis,
368 F.3d 881, 886 (6th Cir. 2004).   The Sixth Circuit has recently employed a three-step inquiry
in reviewing claims of qualified immunity:

> First, we determine whether, based upon the applicable law, the facts viewed in
> the light most favorable to the plaintiffs show that a constitutional violation has
> occurred. Second, we consider whether the violation involved a clearly
> established constitutional right of which a reasonable person would have known.
> Third, we determine whether the plaintiff has offered sufficient evidence to
> indicate that what the official allegedly did was objectively unreasonable in light
> of the clearly established constitutional rights.

Feathers v. Aey, 319 F.3d 843, 848 (6th Cir. 2003) (internal quotation omitted).  Qualified
immunity must be granted if the plaintiff cannot establish each of the three required elements.
Sample v. Bailey, 409 F.3d 689, 696 (6th Cir. 2005).

Plaintiff initially responded to Hessler's motion by opposing it as "premature" insofar as
the parties had not yet engaged in formal discovery.  After affording plaintiff a limited period in
which to pursue formal discovery[3], the court permitted the parties to file supplemental briefs and
supporting materials.

---

[3]Discovery permitted before the court resolves an issue of qualified immunity "should be
tailored specifically to the question of [the defendant's] qualified immunity."  Anderson, 483
U.S. 635, 107 S.Ct. at 3043 n.6.

## III

In assessing Hessler's asserted defense of qualified immunity, the court must first consider the threshold question of whether, taken in the light most favorable to plaintiff, the facts alleged show that Hessler's conduct violated Dandredge's constitutional rights under the Fourth Amendment.   Brosseau v. Haugen, 125 S.Ct. 596, 598 (2004); Saucier, 533 U.S. at 201, 121 S.Ct. at 2156.

Two requirements must be met in order for a plaintiff to successfully prevail on a claim based on the Fourth Amendment.  First, the plaintiff must establish a "seizure" of his person. See California v. Hodari D., 499 U.S. 621, 624, 111 S.Ct. 1547, 1549 (1991).  Second, the plaintiff must establish that the seizure was "unreasonable."   See Elkins v. United States, 364 U.S. 206, 222, 80 S.Ct. 1437, 1446 (1960) ("It must always be remembered that what the Constitution forbids is not all searches and seizures, but unreasonable searches and seizures"). As in Brosseau, this case is governed by the principles enunciated in Tennessee v. Garner, 471 U.S. 1, 105 S.Ct. 1694 (1985) and  Graham v. Connor, 490 U.S. 386, 109 S.Ct. 1865 (1989). According to Garner, "apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment."   471 U.S. at 7,105 S.Ct. at 1699.  And, according to Graham, "*all* claims that law enforcement officers have used excessive force – deadly or not – in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard[.]"  490 U.S. at 395, 109 S.Ct. at 1871.[4]

_____

[4]Where a citizen alleges excessive force in the course of an arrest, "the ruling on qualified immunity requires an analysis not susceptible of fusion with the question of whether unreasonable force was used in making the arrest."  Saucier, 533 U.S. at 197, 121 S.Ct. at 2154.

The Supreme Court explained in <u>Garner</u> that "[w]here [a] suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so. . . .  A police officer may not seize an unarmed, nondangerous suspect by shooting him dead."  471 U.S. at 11, 105 S.Ct. at 1701.  However, "[w]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others," deadly force may be used.  <u>Id</u>.  The reasonableness of the use of force "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  <u>Graham</u>, 490 U.S. at 396, 109 S.Ct. at 1872.

Courts must judge reasonableness with regard to all the facts and surrounding circumstances.  <u>Id</u>., 490 U.S. at 397, 109 S.Ct. at 1872-73.  "Probable cause" to use deadly force existed if, at the moment the force is used, the facts and circumstances within the officer's knowledge and of which he had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the suspect posed a threat of serious physical harm.  <u>See</u> <u>Hunter v. Bryant</u>, 502 U.S. 224, 228, 112 S.Ct. 534, 537 (1991) (probable cause to arrest); <u>see</u> <u>also</u> <u>Graham</u>, 490 U.S. at 396, 109 S.Ct. at 1872 ("With respect to a claim of excessive force, the same standard of reasonableness at the moment applies").  "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation."  <u>Id</u>., 490 U.S. at 396-397, 109 S.Ct. at 1872.  If an officer reasonably, but mistakenly, believed that a suspect poses an imminent threat of serious harm, then the officer was justified in using more force than was needed.  <u>Saucier</u>, 533

U.S. at 205, 121 S.Ct. at 2158.  Therefore, the ultimate question in the court's initial inquiry is not whether Hessler was actually in danger as a matter of fact, but whether it was objectively reasonable for him to believe that he was, given the circumstances within his knowledge at the moment he acted.

In her supplemental brief, plaintiff concedes that her position on the facts does not begin to differ from Hessler's until after the point where Hessler approached the pile of laundry next to the clothes dryer – which was close to the west wall of the laundry room –  with his gun drawn. Plaintiff's Brief Regarding Limited Discovery Conducted in Response to Defendant Hessler's Motion for Summary Judgment, at 4.  Specifically, plaintiff argues that there was sufficient space between Hessler and Dandredge at this point that the shooting could not possibly be considered reasonable.

According to Hessler, he was within one or two feet of touching the laundry pile when Dandredge suddenly "bolted up and towards him" from under the pile, causing Hessler to fear for his life.  Plaintiff, however, argues that Hessler could not have been that close to Dandredge. According to plaintiff, Groenveld's testimony places Hessler in the laundry room doorway immediately after the shot was fired.  In addition, according to plaintiff, forensic and blood spatter evidence suggests that Hessler was farther away from Dandredge than the one to two feet to which Hessler has sworn.  Plaintiff argues that the evidence shows that Hessler shot Dandredge from a distance of nine or ten feet away, thus indicating that he posed no imminent threat to Hessler.

Plaintiff's version of the facts, however, as argued in her supplemental brief, finds no support in the actual evidence.  Relying on a diagram which she contends was part of a

12

Muskegon police report, plaintiff states that the laundry room was 12 by 22 feet.  Plaintiff's Brief

Regarding Limited Discovery Conducted in Response to Defendant Hessler's Motion for

Summary Judgment, at 3.  However, plaintiff has misinterpreted the diagram.  According to a

Michigan State Police report prepared by forensic scientist Glenn Moore (attached as part of his

affidavit, included as Exhibit 4 to Hessler's motion), the laundry room's dimensions were 11 feet

four inches (the length of the north and south facing walls) by six feet eight inches (the length of

the east and west facing walls).[5]  Apparently believing that an enlarged view of the laundry room

included on the diagram of the basement is drawn to the scale indicated on the basement

diagram, plaintiff erroneously and substantially overstates the size of the laundry room, nearly

doubling its size to 12 by 22 feet.   This error presents serious problems for her analysis, for

events occurred in much closer quarters, according to the evidence.

Plaintiff compounds this critical error of misstating the size of the laundry room through

overreliance on the testimony of Groenveld, whose testimony places Hessler in the doorway to

the laundry room immediately *after* the shooting.  However, Groenveld did not see Hessler shoot

Dandredge; Groenveld was walking up the basement stairs when he heard the shot.  Groenveld

testified that he did not know where Hessler was in the laundry room when the shot was fired.

In addition, Hessler testified that he stepped backward as he fired, which could – given the actual

size of the laundry room – have placed him in or near the doorway to the small room after the

shooting.

_____

[5]Moore's measurement of the room has been confirmed by another forensic examiner,
David Townshend, who was formerly employed by the Michigan State Police.  Mr. Townshend
inspected the scene and performed his own measurements.  According to Moore's report, the
bloodletting injury originated in the northwest corner of the laundry room, 15 inches from the
west wall and 35 inches above the floor.

There are no inconsistencies between the statements of the two deputy marshals which raise a genuine factual issue regarding Hessler's actions.  Instead, plaintiff has  falsely created her own factual issue by erroneously placing Hessler in the doorway to the laundry room at least nine feet away from Dandredge when Hessler shot – a circumstance which is not possible insofar as the room from front to back wall measured only six feet eight inches.  Plaintiff's failure to account for Hessler's movement while firing and for any time required, even minimal, for Groenveld to react, even further compounds her errors in interpreting the basement diagram.

Plaintiff has submitted the affidavit of David Balash, a retired Michigan State Police officer who has extensive experience and training in the analysis of crime scenes, shooting investigations, laboratory analysis of gunpowder patterns and gunshot residue, ballistics, characteristics of firearms, and blood spatter interpretation.  Balash opines, in conclusory fashion, that the muzzle of Hessler's gun was "at least 24 inches" from Dandredge's head.  Assuming that this conclusion is based on an accurate interpretation of the facts (and this is not possible to determine given the nature of Balash's affidavit – more about this will follow), this opinion is not inconsistent with Hessler's own sworn statement, in which he places himself within one to two feet of and reaching for the laundry pile at the time Dandredge suddenly revealed himself.

Balash also opines that the location of the spent cartridge discovered after the shooting was "consistent with the weapon being fired by a person in or near the doorway of the laundry room."  Once again, assuming that this conclusion is based on an accurate interpretation of the facts,[6] it is not inconsistent with Hessler's testimony, which has him stepping backward at the

---

[6]According to a report prepared by Muskegon police officer James Plouhar, who was the first officer to arrive on the scene immediately after the shooting, he found a spent shell casing between the washer and dryer, laying on a hat on top of a large pile of dirty clothing.

time he fired, which would have put him closer to the doorway of the small room.  Balash further

opines that Dandredge was "not moving toward" Hessler at the time of the shooting "but rather

was in the relatively same position in which he [Dandredge] was found after the shooting."  But

Balash does not say in what position Dandredge was found after the shooting.  According to the

first officer to arrive on the scene after the shooting, Muskegon police officer James Plouhar,

Dandredge was found in a squatting position, not on his buttocks.  Plaintiff, however, relying on

Groenveld's testimony, places Dandredge "sitting on his buttocks with his legs stretched out in

front of him" after he was shot.  Plaintiff's Brief Regarding Limited Discovery Conducted in

Response to Defendant Hessler's Motion for Summary Judgment, at 4.  A reading of

Groenveld's actual testimony reveals that Groenveld never saw  Dandredge's buttocks or legs

because the lower part of Dandredge's body was concealed with laundry; Groenveld never even

saw Dandredge's lower torso.  Plaintiff's misstatement of the testimony does not create a genuine

issue of fact, and without knowing whether Balash's opinion is based on the actual position of

Dandredge's body, or on plaintiff's mischaracterization of the position of the body, the court

cannot conclude that Balash's unsubstantiated opinion creates a genuine issue.[7]

Finally, Balash opines that Dandredge "was not violently attacking" Hessler at the time

Hessler fired his weapon.  Plaintiff argues that this opinion on the ultimate issue in the case

would be admissible at a trial pursuant to Fed.R.Evid. 704.  However, Rule 704 does not render

Balash's "ultimate issue" opinion sufficient for purposes of creating an issue of fact adequate to

---

[7]Plaintiff has also submitted the affidavit of Dr. Werner Spitz, a pathologist.  Dr. Spitz
opines merely that Dandredge would have been unconscious and would not have been able to
make any voluntary movements after he was shot.  The materiality of this opinion escapes the
court, for it is undisputed that Hessler fired only once.  Hessler has not contended that Dandredge
made any movements after being shot.

avoid summary judgment on a defense of qualified immunity.  To the contrary, the law is clear that an expert affidavit which is entirely conclusory, unsupported by specific data, and premised on unsupportable factual assertions is insufficient to create a genuine issue of fact, even where qualified immunity is not a question in the case.  Williams v. Ford Motor Co., 187 F.3d 533, 543 (6th Cir. 1999).  A party cannot challenge a motion for summary judgment by relying on allegations contained in affidavits that merely state conclusory allegations.  Id. at 544.  The Balash affidavit indicates only what sources the expert reviewed in reaching his conclusions; it does not refer to the specific data on which Balash relied, nor does it include any explanation of his process of reasoning or the methods used to reach his conclusion.  (Because plaintiff has previously admitted to having access to a substantial amount of investigative materials relatively early in the case, the inadequacy of this affidavit is particularly egregious.)  Given the plaintiff's failure to provide "specific facts," as opposed to mere conclusions, Doren v. Battle Creek Health Sys., 187 F.3d 595, 598-599 (6th Cir. 1999), the Balash affidavit does not create a genuine issue of material fact sufficient to defeat summary judgment on the question of qualified immunity.

Plaintiff argues that there is no evidence – other than, of course, Hessler's own sworn statements –  that Dandredge was rising from his hiding place in order to charge at Hessler.  However, there is clear evidence that Dandredge was rising from his hiding place when he was shot, for his body was found only partially concealed in a squatting position.  In addition, plaintiff concedes that Dandredge made no noise indicating an intent to surrender.

Whether Hessler applied unconstitutionally excessive force in shooting Dandredge turns on what a reasonable officer would have done under the same circumstances.  Summary judgment based on qualified immunity is appropriate "when the undisputed material facts, or the

plaintiff's version of disputed material facts, demonstrate that a hypothetical reasonable officer would not have known that his actions, under the circumstances, were objectively unreasonable." Scott v. Clay County, Tenn., 205 F.3d 867, 877 (6th Cir. 2000). Hessler's qualified immunity turns on the reasonableness of his perception of danger at the time, not on whether subsequent circumstances would have revealed the existence of a less deadly alternative. See Scott v. Heinrich, 39 F.3d 912, 915 (9th Cir. 1994) ("Requiring officers to find and choose the least intrusive alternative would require them to exercise superhuman judgment"); see also Illinois v. Lafayette, 462 U.S. 640, 647, 103 S.Ct. 2605, 2610 (1983) ("The reasonableness of any particular governmental activity does not necessarily or invariably turn on the existence of alternative 'less intrusive' means").

What the undisputed facts do show is that Dandredge knew, and Hessler knew that Dandredge knew, that the United States Marshals were looking for him. Dandredge knew, and Hessler knew that Dandredge knew, that Dandredge very likely faced additional prison time in Indiana and also faced potentially serious charges in Michigan involving sexual misconduct with a minor. Dandredge knew that the marshals had tracked him to Henderson's house. In order to avoid capture, Dandredge actively concealed himself in a small, dimly lit, and cluttered laundry room.

Plaintiff does not dispute that it was reasonable for Hessler and Groenveld to be armed while searching for a fugitive, and the marshals had reason to believe both that Dandredge could be violent and that he did not want to return to jail. Dandredge had successfully concealed himself from Groenveld, who had already looked in the laundry room. No evidence indicates that Dandredge was about to surrender or that he communicated any intention of doing so. Even

plaintiff concedes that Dandredge had concealed himself until after Hessler entered the laundry room.   However, Dandredge must have at some point moved, otherwise he would not have been visible to Hessler.  There is no question presented of whether shooting Dandredge was justified to prevent him from fleeing; no evidence shows that Hessler had the time to leisurely ponder Dandredge's escape.  The evidence instead shows that Hessler had sufficient time only to ponder his own safety.

There is no evidence which accounts for any explanation other than that Dandredge suddenly and without warning revealed himself to Hessler.  Dandredge's body was found squatting – not sitting – and partially but not fully concealed, in a pile of laundry.  What Dandredge's actual intentions were in revealing himself no one will ever know for certain. However, the question for purposes of the court's initial analysis not whether Hessler was truly in danger as a matter of fact, but whether it was objectively reasonable for him to believe that he was.  The court concludes that no evidence contradicts Hessler's version of the shooting or the reasonableness of his perception of an immediate threat to his safety.  Given the minimal time and space in which he had to react, it is not possible to conclude that Hessler acted other than as a reasonable officer in placing his own safety before that of Dandredge.  Hessler did not violate Dandredge's Fourth Amendment rights.

Because the court concludes that Hessler's actions did not violate Dandredge's constitutional rights, the second step of the qualified immunity analysis does not come into play. See Saucier, 533 U.S. at 201, 121 S.Ct. at 2156 ("If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity").  However, it is nonetheless appropriate at this point to observe that even if

18

Hessler was wrong about Dandredge's intentions, he is still immune from liability.

"Qualified immunity shields an officer from suit when [he] makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances [he] confronted." Brosseau, 125 S.Ct. at 599.   As the Supreme Court has clarified,

> The deference owed officers facing suits for alleged excessive force is not different in some qualitative respect from the probable cause inquiry . . . . Officers can have reasonable, but mistaken, beliefs as to the facts establishing the existence of probable cause or exigent circumstances, for example, and in those situations courts will not hold that they have violated the Constitution.  Yet, even if a court were to hold that the officer violated the Fourth Amendment by conducting an unreasonable, warrantless, search, [the law] still operates to grant [him] immunity for reasonable mistakes as to the legality of their actions.  The same analysis is applicable in excessive force cases, where in addition to the deference officers receive on the underlying constitutional claim, qualified immunity can apply in the event the mistaken belief was reasonable.

Saucier, 533 U.S. at 206, 121 S.Ct. at 2158-2159.  "The temporal perspective of the inquiry, whether labeled as *ex ante* or *ex post,* offers no meaningful distinction between excessive force and other Fourth Amendment suits. . . .   Excessive force claims, like most other Fourth Amendment issues, are evaluated for objective reasonableness based upon the information the officers had when the conduct occurred."  Id.

Inquiry into whether the constitutional right at issue was clearly established "must be undertaken in light of the specific context of the case, not as a broad general proposition; and it too serves to advance understanding of the law and to allow officers to avoid the burden of trial if qualified immunity is applicable." Id., 533 U.S. at 201, 121 S.Ct. at 2156.  The general tests set out in Graham and Garner, which are "cast at a high level of generality," may provide fair warning to a reasonable officer that his conduct is unconstitutional "in an obvious case," even

19

without a body of relevant case law.  <u>Brosseau</u>, 125 S.Ct. at 599.  Where, however, the case is

not an obvious one, the general standards of <u>Graham</u> and <u>Garner</u> do not alone offer a basis for

decision; rather, in such instances, the court must ask whether, at the time of the officer's actions,

it was clearly established in a more "particularlized" sense that he was violating an individual's

Fourth Amendment rights.  <u>Id</u>.

> This case is not an obvious one; instead it is, like <u>Brosseau</u>, "one in which the result

depends very much on the facts" of the case.  125 S.Ct. at 600.  However, apart from the general

rules of <u>Graham</u> and <u>Garner</u>, plaintiff points only to cases which do not squarely govern the

present situation.  Here, the undisputed facts involve not just a mere suspect, but instead a known

fugitive, having a demonstrated propensity for violence, who was likely destined to return to

prison and has been actively attempting to elude capture.  The fugitive concealed himself in a

dimly lit, cluttered area from federal marshals who made their presence well known.  The

fugitive revealed himself without warning.  None of the precedent on which plaintiff relies

clearly establishes that Hessler's conduct violated the Fourth Amendment in the more

particularized sense of this situation which he confronted.

> Hessler, for his part, relies on the recent case of <u>Sample</u>, which, he argues, stands for the

proposition that an officer searching for a suspect who is hiding from him has an unquestionable

right to protect himself from a possible ambush.  In <u>Sample</u>, a Sixth Circuit panel concluded that

a reasonable officer would be aware "that he could not use deadly force to seize a burglary

suspect, who was unarmed but found hiding in a building at night."  409 F.3d 698.  In that case,

the facts were different: the officers had already found the suspect's hiding place, had seen his

hands, and had ordered him to get out of the cabinet where he had been found hiding; one of the

officers then shot the suspect when he moved his hand, which could have been in response to the command.

However, the panel in <u>Sample</u> carefully distinguished the facts of that case from those in another case, <u>Robinette v. Barnes</u>, 854 F.2d 909 (6th Cir. 1988).  The court in <u>Robinette</u> had concluded that the use of a police dog to apprehend a suspected felon did not constitute deadly force, even though the suspect, who was bitten on the neck by the dog, was fatally injured.  In dicta, the <u>Robinette</u> court indicated that even if use of the dog could be considered deadly force, such force was not unreasonable under the facts of the case, where the officer was forced to explore an enclosed unfamiliar area in which he knew a man was hiding.  Under the circumstances, according to the dicta in <u>Robinette</u>, the officer was justified in using whatever force was necessary, even deadly force, to protect himself and the other officers and to apprehend the suspect.  854 F.2d at 914.

The use of a police dog is, of course, not the same as the use of a firearm, and therefore <u>Robinette</u> is distinguishable from the present case.  However, in <u>Sample</u>, the court indicated that <u>Robinette</u>'s dicta "recognized the inherent dangers facing police officers searching for a suspect who is hiding from them."  <u>Sample</u>, 409 F.3d at 700.  "In such a situation," according to the court, "officers have an unquestionable right to protect themselves from a possible ambush."  <u>Id</u>. The court in <u>Sample</u> distinguished such a situation from that where a suspect has been found and has a gun pointed at him; in that situation, according to the court, no reasonable officer would think it is still constitutionally permissible to shoot.  <u>Id</u>.  Plaintiff has not identified any case demonstrating that a clearly established rule prohibiting Hessler from using deadly force in response to what the undisputed facts show is a reasonable perception of ambush and a need for

self-defense.  The court concludes that the law did not clearly establish that Hessler's actions violated the Fourth Amendment.

Finally, plaintiff has not pointed to evidence which would indicate that what Hessler did was objectively unreasonable in light of the clearly established law.  Here, Dandredge actively concealed himself and made no audible attempt to alert the marshals to his presence, though the circumstances show that Dandredge was undoubtedly aware of the marshals' presence and their purpose for being there.  Even under plaintiff's version of events, Dandredge waited until Hessler was dangerously close to his hiding spot, and only then did Dandredge reveal his presence, doing so in a manner which was reasonably perceived by Hessler as threatening and was consistent with a possible attack, not surrender. Under the circumstances, the court can only conclude that even if Hessler was mistaken about Dandredge's intentions, Hessler is entitled to qualified immunity for his actions.

## **CONCLUSION**

The court grants the motion, and dismisses this case in its entirety.

So ordered this 23rd day of August, 2005.

 /s/ Wendell A. Miles
Wendell A. Miles
Senior U.S. District Judge